1 **WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael K. Kelly, | No. CV 07-2512-PHX-JAT |
| Plaintiff, | **ORDER** |
| vs. | |
| Unum Life Insurance Co. of America, a Maine corporation; and the Welfare Benefit Plan Administrative Committee of Snell & Wilmer, L.L.P., | |
| Defendants. | |

Defendants filed a Motion for Summary Judgment on February 18, 2009. (Doc. #29). Along with their Motion, Defendants filed a separate Statement of Facts in Support. (Doc. #30). Plaintiff has not filed response to the Motion. The Court therefore accepts Defendants' undisputed facts as true. L.R.Civ.P. 56.1(b).

**I. Factual Background**

Plaintiff Michael Kelly was a partner at Snell & Wilmer LLP ("Snell"), a large regional law firm based in Phoenix. (Defendants' Statement of Facts, "DSOF," ¶1). Mr. Kelly had a history of alcohol and drug usage. (DSOF ¶ 2). In late 2003 and early 2004, his performance at Snell began to decline, which resulted in a senior partner requiring Mr. Kelly to seek treatment for addiction. (DSOF ¶3).

In early February 2004, Kelly began seeing Dr. Michel Sucher, a physician who treats patients for addiction. (DSOF ¶4). Dr. Sucher recommended that Mr. Kelly seek inpatient

1  treatment at the Betty Ford Center in California.  (DSOF ¶4).  Mr. Kelly was admitted to the
2  Center for inpatient treatment for cocain dependence on February 24, 2004.  (DSOF ¶4).

3  Mr. Kelly did not complete the treatment program because of his continuing use of
4  cocaine and violation of the rules.  (DSOF ¶5).  The staff at the Center recommended to Dr.
5  Sucher that Mr. Kelly be transferred to another inpatient treatment facility – COPAC in
6  Mississippi – for a higher level of care.  (DSOF ¶5).

7  Mr. Kelly was admitted to COPAC on April 15, 2004 for substance abuse,
8  dependence on cocaine, and methamphetamine use.  (DSOF ¶6).  Mr. Kelly completed
9  COPAC's Phase II treatment program and spent 16 days in the Phase III treatment program.
10 (DSOF ¶6).  COPAC discharged Mr. Kelly on July 28, 2004, with recommendations to go
11 to a halfway house in Phoenix.  (DSOF ¶6).  Mr. Kelly continued outpatient therapy with Dr.
12 Sucher after his discharge from COPAC.  (DSOF ¶7).

13 Mr. Kelly participated in Snell's long-term disability plan (the "Plan"), which is an
14 ERISA plan.  (DSOF ¶8).  On August 3, 2004, Mr. Kelly submitted a disability claim under
15 the Plan.  (DSOF ¶8).  In support of the claim, Dr. Sucher reported that Mr. Kelly had
16 cocaine dependence.  (DSOF ¶8).

17 Snell funded the Plan in part by purchasing a group long term disability plan from
18 Defendant Unum Life Insurance Company ("Unum").  (DSOF ¶32).  The Unum policy
19 provided for monthly benefits if a participant met the definition of total disability ("because
20 of injury or sickness the participant cannot perform each of the material duties of his regular
21 occupation.").  (DSOF ¶9).  The policy also provided that "benefits for disability due to
22 mental illness will not exceed 24 months of monthly benefit payments."  (DSOF ¶9).  Snell
23 decided to add the foregoing mental illness limitation to partner participants in the Plan in
24 2004 in order to save 5% on premiums.  (DSOF ¶37).  Internal Snell memoranda indicate that
25 Snell believed the mental illness limitation would apply to substance abuse claims.  (DSOF

1   ¶35).[1]

2   Unum investigated Mr. Kelly's claim and accepted it. (DSOF ¶10). Unum began
3   paying monthly benefits of $35,000 from August 23, 2004. (DSOF ¶10). Meanwhile, Mr.
4   Kelly also submitted a claim to Paul Revere (Unum's sister company) under an individual
5   disability policy separate from the group policy. (DSOF ¶11). Paul Revere began paying
6   monthly benefits of $7500. (DSOF ¶11).

7   Mr. Kelly and his doctor were required to submit supplemental claimant and attending
8   physician statements to Unum in order to verify that Kelly's disability was ongoing. (DSOF
9   ¶12). Unum paid monthly benefits through June 2005, when it terminated benefits based on
10  Dr. Sucher's report that Kelly had completed treatment, was no longer using drugs, and could
11  return to work. (DSOF ¶12). What Unum and Dr. Sucher did not know, however, was that
12  Mr. Kelly had continued to abuse drugs. (DSOF ¶13).

13  Dr. Sucher later learned of Mr. Kelly's continued drug abuse. (DSOF ¶13). Mr.
14  Kelly's counsel informed Unum of the continued abuse. (DSOF ¶13). After investigating
15  further, Unum resumed disability payments. (DSOF ¶14). Unum paid Kelly's monthly
16  benefits covering June 23, 2005 to August 22, 2006 in one lump sum of $515,200 (and
17  included an additional $57,131 to cover previous underpayments). (DSOF ¶14). As of
18  August 22, 2006, Mr. Kelly had received 24 months of payments, the maximum amount
19  allowed under the Plan for a mental illness. (DSOF ¶14). Unum paid a total of $865,200 for
20  the 24-month period. (DSOF ¶14).

21  In a letter dated August 16, 2006, Unum, as the claim administrator, informed Mr.
22  Kelly's counsel that Mr. Kelly would reach the 24-month maximum duration date as of
23  August 22, 2006, and that Mr. Kelly's benefits would end. (DSOF ¶15). Unum invited Mr.
24  Kelly to submit evidence showing his disability was not subject to the mental illness

---

[1] "We could cut the cost of the plan further by limiting the benefits for disabilities associated with mental and nervous disorders (a category that includes substance abuse and stress.)" (DSOF ¶35, Ex. LL p. 373).

- 3 -

1 limitation. (DSOF ¶15).

2 On September 15, 2006, in his response, Mr. Kelly's counsel wrote that Mr. Kelly suffered from both cocaine addiction and depression. (DSOF ¶16). Counsel acknowledged that depression was a mental illness, but argued that cocaine addiction had both physical and mental causes and physical and mental symptoms. (DSOF ¶16). Three days later, counsel provided Dr. Sucher's declaration that stated:

> Severe substance abuse occurring over an extended period of time, such as that sustained by Mr. Kelly, may cause neurological and cognitive impairment which can impair a person such as Mr. Kelly from performing high level, high stress work for an extended period of time after that person stops his or her substance abuse.
>
> Although the causes of Mr. Kelly's cocaine addiction include some psychological components, the causes also include physical components, including changes in brain chemistry. Similarly, although the addiction manifests itself through certain psychological symptoms, such as his depression, the addiction also has certain physical symptoms, such as physical craving of cocaine.

(DSOF ¶17).

Unum had these materials reviewed by Dr. Stuart Shipko, who is a Diplomate of the American Board of Psychiatry and Neurology. (DSOF ¶18). Dr. Shipko pointed out that although Dr. Sucher's declaration stated that substance abuse may cause neurological and cognitive impairment, Dr. Sucher did not indicate that Mr. Kelly, specifically, had suffered from neurological or cognitive impairment. (DSOF ¶18). Dr. Shipko noted that Dr. Sucher's progress notes on Mr. Kelly did not support a finding of either neurological or cognitive impairment. (DSOF ¶18). Dr. Shipko also advised that "addiction, anxiety and depression are all mental illnesses as defined by the DSM-IV." (DSOF ¶18). Dr. Shipko further commented that although drug craving may have correlations with biochemical or physiological processes, it remained a behavioral symptom. (DSOF ¶18). Dr. Shipko determined that Mr. Kelly's disability resulted from a mental, not physical, illness. (DSOF ¶18).

- 4 -

1  Dr. Shipko asked another physician (in a different office), Dr. Peter Brown, to give
2 a second opinion. (DSOF ¶19). Dr. Brown is a board-certified psychiatrist. (DSOF ¶19).
3 Dr. Brown noted that cocaine dependence is treated by mental health specialists, including
4 psychiatrists and addictionalogists, using commonly accepted mental health treatment
5 techniques, such as psychotherapy and psychotropic medications. (DSOF ¶19). Dr. Brown
6 concluded that cocaine addiction is a mental disorder. (DSOF ¶19).

7  Unum reviewed all the information in the file, including the opinions of Drs. Sucher,
8 Shipko, and Brown, and concluded that Mr. Kelly's claim was subject to the mental illness
9 limitation. (DSOF ¶20). Unum informed Mr. Kelly's counsel of its decision and the basis
10 for that decision on September 29, 2006. (DSOF ¶20). Unum also advised counsel of Mr.
11 Kelly's appeal rights. (DSOF ¶20).

12  Mr. Kelly filed an administrative appeal through counsel on March 30, 2007. (DSOF
13 ¶21). Mr. Kelly argued that he had suffered cognitive and mental impairment as a result of
14 his addiction. (DSOF ¶21). Mr. Kelly challenged Unum's decision to have two psychiatrists
15 review his claim, rather than obtaining an independent medical exam. (DSOF ¶21). He also
16 claimed that Unum unreasonably relied on the DSM's categorization of addiction as a mental
17 disorder because the DSM itself states that the DSM does not necessarily establish that a
18 condition is a mental disorder for legal purposes. (DSOF ¶21). Mr. Kelly further argued that
19 cocaine dependence has biological and organic, as well as mental, components. (DSOF ¶21).
20 Mr. Kelly therefore asserted that the Unum erred in applying the "ambiguous" mental illness
21 limitation to his disease. (DSOF ¶21).

22  Unum referred the matter to an independent appeals unit to handle the appeal. (DSOF
23 ¶23). The appeals unit had two nurses and a neurologist review Mr. Kelly's file. (DSOF
24 ¶23). The appeals unit also requested that the neurologist speak with Dr. Sucher, the treating
25 physician. (DSOF ¶28). The two nurses who reviewed the file concluded that there was no
26 evidence that Mr. Kelly suffered from neurological or cognitive impairment. (DSOF ¶24).
27  Dr. Alan Bachrach, a board-certified neurologist, then reviewed the file. (DSOF ¶25).
28

- 5 -

1  Dr. Bachrach determined that Mr. Kelly's disabling condition was psychiatric (polysubstance
2  abuse and addiction). (DSOF ¶25). Dr. Bachrach noted that various care providers had
3  diagnosed Mr. Kelly with several different Axis II disorders (pervasive or personality
4  conditions) including, histrionic, narcissistic, and other personality traits. (DSOF ¶25). Dr.
5  Bachrach found that those disorders were likely the most significant causes of Mr. Kelly's
6  inability to return to full-time work. (DSOF ¶25).

7  Dr. Bachrach opined that Mr. Kelly was not cognitively or neuropsychologically
8  impaired at the time his claim was terminated. (DSOF ¶26). Dr. Bachrach noted that Mr.
9  Kelly had never undergone neuropsychological testing or had an MRI and that the result of
10 his one physical neurologic exam was normal. (DSOF ¶26). Dr. Bachrach explained that
11 the minor cognitive deficits found in Mr. Kelly's various mental status examinations were
12 consistent with those seen in patients who use stimulants. (DSOF ¶26). Dr. Bachrach found
13 no clear and consistent evidence that Mr. Kelly had suffered from any cognitive problems
14 or observable neurologic impairment. (DSOF ¶26).

15 Dr. Bachrach telephoned Dr. Sucher to discuss Mr. Kelly's case. (DSOF ¶28). Dr.
16 Sucher opined that Mr. Kelly did not have an independent neurologic disease, separate from
17 his problem with addiction, which was primarily a psychiatric issue. (DSOF ¶28). Dr.
18 Sucher later signed a written summary of the conversation that reaffirmed his assessment.
19 (DSOF ¶28).

20 After a final review of the entire record, Unum upheld the determination that Mr.
21 Kelly's benefits were subject to the mental illness limitation. (DSOF ¶29). Mr. Kelly
22 thereafter filed this case.

23 **II. Analysis**

24 When an ERISA plan gives the plan administrator or fiduciary discretionary authority
25 to determine eligibility for benefits, the Court reviews a decision to deny or terminate
26 benefits for abuse of discretion. *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 981
27 (9th Cir. 2005). The Plan here gave the claim administrator discretionary authority: "In
28

- 6 -

1 making any benefits determination under the policy, [Unum] shall have the discretionary
2 authority both to determine your eligibility for benefits and to construe the terms of the
3 policy." (DSOF ¶33). The Court therefore reviews Unum's plan benefit termination for
4 abuse of discretion. When considering whether Unum abused its discretion, the Court may
5 review only the administrative record that was before Unum. *Abatie v. Alta Health & Life*
6 *Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006).

7 The abuse of discretion standard of review does not change just because Unum is both
8 the claim administrator and payor and therefore has a structural "conflict of interest." *Metro.*
9 *Life Ins. Co. v. Glenn*, __ U.S. __, 128 S.Ct. 2343, 2350-51 (2008); *Abatie*, 458 F.3d at 965.
10 Rather, the Court considers the structural conflict as just one factor in determining whether
11 the administrator abused its discretion. *Metro. Life*, 128 S.Ct. At 2350. The Court looks at
12 all the facts and circumstances of the case to determine how much weight to give the
13 administrator's reason for denying a claim. *Abatie*, 458 F.3d at 968. When a structural
14 conflict is not accompanied, for example, by any evidence of malice, self-dealing or
15 parsimonious claims-granting history , the Court has little reason to doubt the administrator's
16 stated reason for denial or termination of benefits. *Id*. Mr. Kelly has not introduced any
17 evidence of malice, self-dealing, or a history of Unum denying claims. The Court therefore
18 will give little weight to Unum's structural conflict of interest.

19 After reviewing the undisputed record, the Court finds that Unum did not abuse its
20 discretion in terminating Mr. Kelly's disability benefits pursuant to the Plan's 24-month
21 mental illness limitation. The record before Unum contained numerous professional
22 opinions, from psychologists, nurses, and a neurologist, that Mr. Kelly's disability resulted
23 from drug addiction, which they found was a mental illness. In fact, the DSM IV,[2] which the
24 Court recognizes is not legally determinative, classifies addiction as a mental disorder.

---

26 [2]DSM refers to the American Psychiatric Association's Diagnostic and Statistical
27 manual. It is the standard classification of mental disorders used by mental health professionals in the United States.

- 7 -

Further, although Mr. Kelly's treating physician, Dr. Sucher, opined that prolonged drug addiction like Mr. Kelly's can lead to cognitive and neurological deficits, he did not state that Mr. Kelly in fact suffered from such deficits. Nor did Mr. Kelly present Unum with any physical test results, such as an MRI scan, showing cognitive or neurological damage.

The file before Unum supports its decision that while Mr. Kelly's addiction may have resulted in both mental and physical symptoms, the symptoms and the causes of his addiction were primarily mental in nature. Even Dr. Sucher, Mr. Kelly's treating physician, conceded that Mr. Kelly's addiction was primarily a psychiatric issue. Given that record, the Court finds that Unum did not abuse its discretion in finding that the mental health limitation unambiguously applied to Mr. Kelly's claim.[3]

Accordingly,

IT IS ORDERED GRANTING Defendants' Motion for Summary Judgment (Doc. #29).

DATED this 14th day of April, 2009.

_____
James A. Teilborg
United States District Judge

---

[3] The Court notes that the doctrine of *contra proferentem*, which courts have used to construe ERISA plan provisions against plan administrators, does not apply here because the Plan granted Unum the discretion to construe the Plan's terms. *Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 625 (9th Cir. 2007).